

**SO ORDERED.**

**SIGNED this 07 day of February, 2006.**

_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **TIMOTHY ALAN HUNDLEY and** | ) | **Case No. 05-13580** |
| **PATRICIA LYNNE HUNDLEY,** | ) | **Chapter 13** |
| | ) | |
| Debtors. | ) | |
| | ) | |

### ORDER DETERMINING VIOLATION OF AUTOMATIC STAY AND ASSESSING
### SANCTIONS PURSUANT TO 11 U.S.C. § 362(h) (West 2004)

Debtors Timothy and Patricia Hundley seek a determination that Commercial Bank ("Bank")

violated the automatic stay when it refused debtors' post-petition demand to turnover debtors' 1999

Chevy Blazer that the Bank had repossessed pre-petition. Debtors demand the payment of sanctions

for the Bank's actions which debtors consider to be willful and therefore remediable under former

11 U.S.C. § 362(h).[1]

_____

[1]  Unless otherwise noted, all subsequent statutory references are to the Bankruptcy Code, Title 11, U.S.C. Because this bankruptcy case was commenced before the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") the former provisions

-1-

<u>Introduction</u>

Debtors filed their chapter 13 petition on June 10, 2005. A week later, debtors moved for turnover of their 1999 Chevy Blazer that had been repossessed by the Bank on June 2, 2005.[2] At a non-evidentiary, expedited hearing held on June 29, 2005, the Court ordered the Bank to turn over the vehicle and directed debtors to pay the repossession fee, provide proof of insurance and make as adequate protection payments, the payment provided for in debtors plan of reorganization that had been filed June 21, 2005.[3] The Court set over for an evidentiary hearing, the remaining issue of sanctions for the Bank's alleged willful violation of the automatic stay. The matter was tried on September 27, 2005 and the Court directed the parties to file simultaneous post-trial briefs within 15 days.[4] After receiving post-trial briefs from the parties, the Court took the matter under advisement.

<u>Jurisdiction</u>

This proceeding is a core proceeding that arises in a case under Title 11.[5] The Court has

of the Bankruptcy Code, notably § 362, govern this controversy.

[2] Dkt. 6.

[3] Dkt. 17.

[4] The Bank has moved to strike the debtors' post-trial brief on the basis that it was untimely submitted and contains evidence and new matters that were not presented at trial. Dkt. 30. The Court has reviewed the debtors' brief and agrees with the Bank that it was filed seven days late and contains new evidence that was not presented at trial and is not part of the record before the Court, namely the declaration of Mandy Ammerman regarding insurance on the vehicle. The Bank's motion will therefore be granted in part and the Court will disregard any new factual matters presented in debtors' brief.

[5] 28 U.S.C. § 157(b)(1) and (b)(2)(E).

Case 05-13580   Doc# 34   Filed 02/07/06   Page 2 of 13

jurisdiction over this contested matter.[6]

Facts

The Bank properly repossessed debtors' 1999 Blazer on June 2, 2005. Debtors had been in payment default for about three months. The Bank used the services of Southwest Service Company which repossessed the Blazer, taking it to a detail shop on June 8th or 9th to prepare the vehicle for sale[7] and then to the auction.

On June 10, debtors filed their Chapter 13 petition. On June 14, 2005, debtors' counsel, Mark Lazzo, faxed a copy of the Court's notice of bankruptcy filing to the Bank's officer, Jack Freisberg, who was handling debtors' loan[8]. Therefore June 14 is more likely than not the first time the Bank was made aware of the filing and the attachment of the stay.[9] Although much of the inter-attorney contact in the case is disputed, debtors' counsel asserts that he visited with the Bank's local nonbankruptcy counsel concerning the return of the vehicle on June 13 or 14. The Court assumes Mr. Lazzo would not have contacted Mr. Freisberg without the local lawyer's permission and therefore concludes that both contacts occurred on June 14. When the vehicle was not promptly returned, debtors filed a motion for turnover on June 17.[10]

Thereafter, the Bank retained the Klenda Mitchell law firm, to represent it here.[11] On June

---

[6] 28 U.S.C. § 1334(b). *See* Fed. R. Bankr. P. 9014.

[7] Bank Ex. 2.

[8] Debtors Ex. 1.

[9] The Court did not have the benefit of testimony from a representative of the Bank. The Bank's counsel concedes that the Bank had actual notice of the debtors' bankruptcy by June 14.

[10] Dkt. 6.

[11] Dkt. 8, Entry of Appearance filed June 21, 2005.

-3-

21, debtors' counsel conferred with J. Michael Morris who advised Mr. Lazzo that the Bank would release the vehicle and that all details in that connection could be worked out with Mr. Morris' associate, Ms. Newell.

Apparently, at that juncture, the parties could not agree on what debtors would pay to obtain return of their vehicle. Based upon prior practice and custom in this District, debtors agreed to pay the repossession fee and advised the Bank that the vehicle was insured for six months.[12] The negotiations for turnover of the vehicle broke down when debtors refused to pay the storage fees.

According to Southwest's representative, Bruce Mellicker, the vehicle remained at the auction for a "day or two" and was then retrieved by Southwest at the Bank's direction. Southwest held it until this Court ordered that the Bank release it on June 29.[13] When the Court ordered the car released at the expedited hearing, it also ordered debtors to pay the repossession fee of $330 (because the repossession was legally justified) as well as storage costs from the date of repossession (June 2) to the date of filing bankruptcy (June 10), that being the earliest that the Bank could have had notice of the debtors' bankruptcy. Debtors paid the repossession fee of $330 and prepetition storage fees for 8 days at $15.00 per diem, the rate that Southwest charges debtors.[14] Banks are charged $8.95. Debtors were apparently not assessed the $75 detail fee.[15] When the debtors recovered their car, they claimed that the cargo net was missing and replaced it with a new one

---

[12] The Bank's counsel conceded in her proffer of testimony that return of the vehicle was not held up by debtors' supplying the proof of insurance.

[13] From the testimony of Mr. Mellicker, it appears the vehicle was stored on Southwest's premises for all but the two days the vehicle was being detailed (June 8-9).

[14] Bank Ex. 6, 7, 10.

[15] Bank Ex. 2.

-4-

purchased at a dealership at a cost of $120.00.[16]

The debtors seek as sanctions forfeiture of the repossession fee ($330)[17], replacement of the cargo net ($120); the difference in the storage fee between that charged debtors and that charged lenders ([$15.00-$8.95] x 8 days = $48.40); additional gas/mileage expense while debtors were without the Blazer ($77.40);[18] and attorney fees of $2,257.50 (12.9 hours @ $175/ hour). Debtors do not seek punitive damages.

Analysis

The Bank asserts that while the debtors were entitled to recover the vehicle once they provided it adequate protection, the Bank had a legal right to retain it in furtherance of its security interest and did not violate the stay by doing so. In particular, the Bank relies on the exception to the stay listed in former § 362(b)(3) which provides that the automatic stay does not preclude acts "to maintain or continue the perfection of, an interest in property" to the extent the trustee's rights are subject to that perfection under § 546(b). That code section provides that the trustee's avoiding powers are subject to "any generally applicable law that . . . provides for the maintenance or continuation of perfection of an interest in property" in which the creditor has obtained an interest before the date on which action is taken to maintain or continue perfection.[19] Asserting that its repossession agent Southwest (not the Bank) would have lost its Kansas statutory garageman's lien

---

[16]  Debtors Ex. 9.

[17]  In closing argument, debtors' counsel admitted that the Bank's prepetition repossession was lawful and effectively conceded there was no basis for the Court to penalize the Bank for a lawful repossession by requiring forfeiture of these fees. The Court considers this claim for sanctions abandoned.

[18]  Debtors Ex. 10

[19]  § 546(b)(1)(B).

-5-

had it released the vehicle, the Bank argues that it was under no duty to request the release of the

collateral from Southwest.  It relies on authority from the Ninth Circuit Bankruptcy Appellate Panel

in support of this view.[20]  There is no Tenth Circuit Court of Appeals decision on point.

There is, however, persuasive authority of the Tenth Circuit Bankruptcy Appellate Panel

(BAP) that holds in no uncertain terms that when a creditor retains repossessed collateral after a

chapter 13 bankruptcy case is filed, that creditor violates the stay, which applies not only to taking

possession of property of the estate, but also to exercising control over property of the estate.[21]  In

*In re Yates*, the BAP concluded that retaining repossessed property is just the kind of continuing

action that the stay prohibits.[22]  Here, there is no real dispute in the record that the Bank, through its

agent Southwest, held onto the vehicle well after learning of debtors' bankruptcy filing in an

apparent attempt to extract payment of the storage charges from debtors.

The Bank's analysis and argument gloss over some critical legal distinctions.  First, it asserts

that its repossession agent Southwest needed to retain possession of the vehicle to retain its statutory

garageman's lien.  The Bank cites as authority for that proposition, KAN. STAT. ANN. § 58-208

(1994).  That statute provides that a bailee "having a lien on the goods" in its possession for six

months or more, may proceed to sell the goods.  This statute does not confer a lien on a bailee –

rather it merely provides a remedy to a bailee who has obtained a lien by other legal means on

---

[20] *See In re Hayden*, 308 B.R. 428 (9th Cir. BAP 2004); *In re Boggan*, 251 B.R. 95 (9th Cir. BAP 2000).

[21] *See In re* Yates, 332 B.R. 1, 7 (10th Cir. BAP 2005); *See also* § 362(a)(3).

[22] *Id.* at 4 (Noting that § 542(a) mandates that a creditor turnover property of the estate in the creditor's possession at the time of filing and prohibits the continued exercise of control over property of the estate).

-6-

property and held it for six months.[23]  Likewise, another statute dealing with storage fees for motor vehicles, KAN. STAT. ANN. § 58-247 (2004 Supp.), does not create a statutory lien for storage fees but requires notice to be given to the owner and lienholder in order to accrue storage fees beyond thirty days.  Here, Southwest was in possession of the Blazer less than thirty days.

KAN. STAT. ANN. § 58-201 (1994) may confer a statutory lien for towing and storage, but by its terms, the work must be performed "at or with the owner's request or consent."[24]  The debtors here did not request or consent to Southwest towing and storing their Blazer.  In the absence of such a request or consent, no lien for storage fees was created in favor of Southwest under this statute.

This leaves a lien at common law and the remaining statute cited by the Bank for imposition of a statutory lien for storage fees, KAN. STAT. ANN. § 8-1103(a) (2004 Supp.).  A common law lien is created by an agreement with the owner of the property.[25]  No common law lien for storage fees exists except for a person "engaged in that business, or in an occupation to which it is incidental . . . ."[26]  Southwest cannot be characterized as a bailee recognized at common law as having a lien for storing goods.  Nor did debtors have an agreement with Southwest to store their vehicle, an essential element of a common law possessory lien in favor of a bailee.

---

[23] *Hartford Ins. Co. v. Overland Body Tow, Inc.*, 11 Kan. App. 2d 373, 376-77, 724 P. 2d 687 (1986).

[24] *Id.* at 374 (K.S.A. 58-201 does not create a lien for storage charges for a motor vehicle towed and stored at the direction of a police officer.).

[25] *Id.* at 377. *See generally, Northeast Kansas Prod. Cred. Ass'n v. Ferbache*, 236 Kan. 491, 493-95, 693 P.2d 1152 (1985) (summarizing the variety of liens on personal property under common law (dependent upon possession of the property) and various statutes).

[26] *See First National Bank of Anthony v. Kilborn*, 114 Kan. 29, 31, 216 Pac. 812 (1923) (describing bailees having a lien for storage fees at common law: innkeepers, common carriers, and warehousemen).

The remaining statute, KAN. STAT. ANN. § 8-1103(a) (2004 Supp.) generally confers on a towing company a priming lien on a vehicle towed at the direction of the police or its owner where the towing company provides "recovery, transportation, protection, storage or safekeeping" of the vehicle. Unlike KAN. STAT. ANN. § 58-201, this statute deems a secured party who has a possessory right to a vehicle the "owner" for purposes of the Motor Vehicle Act.[27] The Bank could therefore direct Southwest to repossess and store the debtors' vehicle and when Southwest did so, it obtained a lien for storage charges which would have to be satisfied from the proceeds upon disposition of the vehicle or to secure release of the vehicle back to debtors.[28] The Bank's right to collect those expenses from the debtors is part of the bundle of rights it acquired when the debtors granted it an Article Nine security interest in the vehicle, and not a function of Southwest's statutory lien. The Bank is entitled to add the expenses of repossession, refurbishment and storage to its debt and, in the nonbankruptcy context, collect that from the debtors.[29] In bankruptcy, these charges become a part of the Bank's claim.

Second, the debtors do not charge Southwest with violating the stay. Their motion is rightly directed at the Bank who, as principal, directed its agent, Southwest's actions. The perfection of the Bank's prepetition security interest in no way depended on possession of the vehicle. Unlike the case before this Court, both Ninth Circuit BAP cases upon which the Bank relies deal with creditors holding valid statutory possessory liens against the collateral in question.

---

[27] *See* KAN. STAT. ANN. § 8-126(n) (2004 Supp.).

[28] *See* § 8-1103(a). The Court observes that it is not apparent from the record that Southwest gave written notice to the debtors at the time of the repossession as required by § 8-1103(b) to validate its lien for storage fees.

[29] *See* KAN. STAT. ANN. §§ 84-9-601(a), 84-9-207, and 84-9-615 (2004 Supp.).

-8-

In *In re Boggan*,[30] the creditor, a Ford dealership, retained possession of a vehicle it repaired for the debtor pre-petition, relying on an Idaho mechanic's lien statute. The Ninth Circuit Bankruptcy Appellate Panel properly concluded that because the creditor had to retain the car to continue and maintain its perfection, the creditor's actions fell under the § 362(b)(3) exception to the stay. The BAP pointed out that the Idaho statute created a lien that fully meshed with § 546(b)(1)(B) which subjects the trustee's rights to any applicable law that (1) provides for the maintenance or continuation of an interest in property (2) to be effective against an entity acquiring rights in the property (3) before the date the action to maintain or continue is taken. The Idaho statute conferred a priming mechanic's lien on goods repaired or improved by the mechanic to secure payment. Possession of the goods was required to perfect and maintain perfection of the lien.

Relying on *Boggan, In re Hayden* reaches a similar conclusion.[31] In *Hayden*, a Washington state trooper ordered impoundment of a vehicle after citing debtor for driving on a suspended license. When pursuant to Washington law the tow company sought to sell the vehicle at auction, the debtor filed a Chapter 13 case and sued the tow company for violating the stay by retaining the vehicle post-petition. Applying the same analysis in *Boggan* to Washington's storage lien statute, the BAP concluded that the statutory possessory lien met the test of § 546(b)(1)(B) and that the tow company's actions were within the § 362(b)(3) "maintain and continue" perfection exception to the stay.

Were debtors seeking sanctions against Southwest for retaining the Blazer, these cases would

---

[30]  251 B.R. 95 (9th Cir. BAP 2000).

[31]  308 B.R. 428 (9th Cir. BAP 2004).

Case 05-13580   Doc# 34   Filed 02/07/06   Page 9 of 13

be relevant and persuasive. However, debtors apparently recognize that Southwest was acting as the Bank's agent and they proceed here against the Bank. The Bank does not contend otherwise. The maintenance or continuation of perfection of the Bank's security interest has nothing whatever to do with possession of the Blazer because the Bank's "lien" was perfected under the vehicle titling statute, KAN. STAT. ANN. § 8-135 (2004 Supp.). Instead, the Bank's dogged retention of the Blazer in the face of notice of the debtors' bankruptcy petition and their counsel's request for its return falls squarely within the conduct proscribed by § 362(a)(3).

Although handed down after the events in this case, the Tenth Circuit BAP opinion in *Yates* is persuasive precedent here.[32] In *Yates*, a Wyoming credit union repossessed various items of the debtor's property pre-petition and declined to return a pickup truck after the debtor filed a Chapter 13 case. The BAP held that retention of the vehicle by a repossessing creditor after receiving notice of the filing of a Chapter 13 petition violated the stay provisions of § 362(a)(3). As the Bank rightly points out, the *Yates* panel did not consider the effect of § 362(b)(3), but the operation of that statute was not implicated by the facts in the case. This Court sees no reason why the rule in *Yates* would not apply here.

When this Court ordered the car released in late June, it fell to the Bank to instruct Southwest to proceed. Indeed, under § 362(a)(3), § 542(a), and *Yates*, it fell to the Bank to do that as soon as Mr. Freisberg received Mr. Lazzo's fax notice of the bankruptcy filing. Because the Bank had to pay Southwest to effect release of the vehicle, the Court ordered the debtors to pay the storage bill from June 2 to June 10, the date of their filing. Once the debtors did so, the vehicle should have been released immediately. This Court concludes that the Bank did in fact willfully violate the stay

---

[32] 332 B.R. 1 (10th Cir. BAP 2005).

by retaining the vehicle from the date it received notice of the filing until the date the Court ordered it released in spite of debtors' demands and without seeking stay relief or adequate protection from the Court.[33]

With this finding, the Court now considers the sanctions requested by debtors. There is no question that the Bank had notice of the filing not later than June 14, the date of Mr. Lazzo's fax to Mr. Freisberg. On that date, the vehicle should have been released if the Bank had been provided with evidence of insurance and reimbursement of the repossession fee and storage charges from the date of repossession to the date of notice. The debtors should not have had to wait beyond the time they provided insurance evidence and tendered the fees and charges. Here, however, the debtors were precluded from possession for another fifteen days, or until the matter came on for hearing on June 29, 2005.

Debtors claim an array of damages for the stay violation under § 362(h). They seek reimbursement for the lost cargo net, extra gas expense because they were forced to drive the family's other less efficient car, the price differential charged lenders and debtors by Southwest for storage fees, and their attorneys fees. Former § 362(h) states that an individual injured by a wilful violation of the stay "*shall* recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." Here, it is established that the Bank knew of the stay and intentionally retained the vehicle from June 14 until June 29.[34]

---

[33] As noted in *Yates*, a willful violation does not require a specific intent to violate the stay. All that is required is that the creditor knew of the stay and the creditor's actions were intentional. The creditor's good faith belief that it had a right to retain the property is not relevant. 332 B.R. at 7, *citing Diviney v. NationsBank of Texas, N.A. (In re Diviney)*, 225 B.R. 762, 773 (10th Cir. BAP 1998).

[34] *Id.*

-11-

The debtors did not meet their burden of proof concerning the cargo net as the Court found credible, Mr. Mellicker's testimony that the net was not with the Blazer when he repossessed it. Taken with Mrs. Hundley's refusal to sign the property receipt and failure to protest the missing cargo net at the time she recovered her other personal property, the Court cannot determine that the vehicle had a cargo net prior to its repossession and denies debtors' claimed damages of $120. The Court finds Mrs. Hundley's unsworn declaration in Exhibit 10 and her trial testimony concerning the gas mileage expense incurred by driving the less-efficient Buick to be speculative at best and denies the $77.40 claim for gas mileage. The Court concludes that debtors should not have had to pay the Bank any more than $8.95 per day for storage because it was the Bank's duty to release the vehicle. Had it done so rather than simply sending the debtors, they would not have had to pay $15 per day for storage. The debtors are therefore entitled to recover $6.05 per day from the Bank for storage costs from June 2 to June 10, 2005, or $48.40.

With respect to attorneys fees, the Court concludes that this controversy was attended by some level of intransigence on each side. All counsel in this case should be well aware of the Court's viewpoint concerning turnover of repossessed vehicles to Chapter 13 debtors as it has often been expressed from the Bench over the past six years. Although it took the Bank's local lawyer some 6 days, from June 14 to June 20, to hire Mr. Morris, any lawyer who represents a Bank should have some rudimentary understanding of the stay and its effect. It does appear that once Mr. Morris became involved, communications improved. The Court cannot determine whether one side or the other was more "at fault" in hindering the course of the discussion between June 21 and June 29. The Bank says that Mr. Lazzo was slow to produce insurance proof, while Mr. Lazzo says that Bank's counsel was slow to return calls and linked return of the vehicle to anticipated plan

-12-

treatment. Nonetheless, the debtors had to go to Court to secure return of the vehicle and incurred legal expense in so doing. The Court finds that the reasonable attorney's fees and costs to be assessed the Bank in this connection are as requested by debtors' counsel, $2,257.50.

In ordinary cases, this Court will nearly always grant turnover of a vehicle to a Chapter 13 debtor in circumstances like these when evidence of insurance paid up for the ensuing six months is presented and adequate protection measures are offered, such as treatment of the debt in a filed Chapter 13 plan. If the creditor seeks adequate protection beyond that offered by the debtor, it should promptly bring its issues before the Court. Likewise, debtors who believe the creditor is acting unreasonably should promptly bring their concerns to the Court. In ruling on future motions of this sort, the Court will keep in mind the wisdom of Judge Klein writing in concurrence in *Boggan*: "[I]t behooves all parties to bring any disagreement promptly to court and to have comported themselves in a manner in which they appear to have been attempting to be reasonable, especially as to the key issue of adequate protection."[35]

IT IS SO ORDERED.

# # #

---

[35] 251 B.R. at 103.